Argued and submitted February 21, affirmed May 9, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# DALE ALLEN BUSH,
*Appellant.*

980154; A106479

25 P3d 368

Robin A. Jones, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, State Public Defender.

Kathleen Cegla, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

**BREWER, J.**

Defendant appeals from convictions on two counts of delivery and one count of possession of a controlled substance, ORS 475.992 (counts I, II, and III); separate counts of unlawful possession of a machine gun and a short-barreled shotgun, ORS 166.272 (counts VI and XIII); six counts of being a felon in possession of a firearm, ORS 166.270 (counts VII through XII); and three counts of unlawful possession of a destructive device, ORS 166.382 (counts XIV through XVI). Defendant argues that the search warrant used to obtain evidence against him did not include sufficient information to distinguish his property from a neighboring property, thus rendering the search unlawful under the United States and Oregon Constitutions. Defendant also argues that the trial court erred at sentencing in finding, contrary to the indictment, that his convictions arose from separate criminal episodes. We review for errors of law, *State v. Ehly*, 317 Or 66, 854 P2d 421 (1993); *State v. Knight*, 160 Or App 395, 403, 981 P2d 819 (1999), and affirm.

Defendant was indicted on 20 separate drug and weapons charges after the police searched his rural residence and associated property.[1] The indictment alleged that all of the charged offenses were part of the same criminal "act and transaction." ORS 132.560(1).[2] Defendant moved to suppress the evidence seized from his property on the theory that the warrant authorizing the search was fatally defective.

---

[1] The trial court dismissed four counts before trial, the jury found defendant not guilty on one count, and the trial court found defendant not guilty on one count for which defendant had waived his right to a jury trial.

[2] ORS 132.560(1) provides, in part:

"A charging instrument must charge but one offense, and in one form only, except that:

"* * * * *

"(b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:

"(A) Of the same or similar character;

"(B) Based on the same act or transaction; or

"(C) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

At the suppression hearing, Deputy Tiffany, a detective with the Hood River County Sheriff's Office, testified about the events leading up to the search. In August 1998, deputies engaged an informant to make two controlled purchases of methamphetamine from defendant at his residence. Based on information received from the informant, Tiffany prepared an affidavit and a search warrant. In preparing the affidavit and search warrant, Tiffany looked up the legal description of defendant's property and consulted a map at the county assessor's office. According to the jacket of the property's appraisal packet, defendant's mailing address was 3671 Paul Partlow Road. However, the address "3891 Paul Partlow Road" was handwritten in pencil on the jacket as well. Workers in the assessor's office told Tiffany that the handwritten notation was probably more accurate, so Tiffany used 3891 as the road address for the warrant. He also included the tax lot number and a description of the property, "just to make sure there was no problem." Based on Tiffany's affidavit, the court issued a warrant for the search of defendant's property.

The warrant instructed "any Police officer" that:

"You are hereby authorized to search the premises located at:

"3891 Paul Partlow Rd. Hood River County, Hood River, Oregon, Hood River Tax lot 2N 9 36 200 described as follows:

"8.32ac with a two story wood frame single family dwelling, faded white in color with the front door facing south. A wood framed garage sets [sic] on the west side of the residence, and outbuildings located north of the residence. To the south of the residence is a wooden framed building referred to as the 'car barn'. Also to the east of the residence is [sic] several vehicles which appear to me to be abandoned and in various stages of disassembly. In addition to all out buildings located on the property owned by [defendant], 3891 Paul Partlow Rd.

"For: Evidence of the crimes of Possession of controlled substances, delivery of controlled substances, felon in possession of a firearm and possession of stolen property, to wit: Methamphetamine, $20.00 Bills, Scales, packaging equipment, and materials, paraphernalia use [sic] to ingest

methamphetamine, evidence of occupancy, drug records, firearms, a pickup and motorcycle."

Tiffany's affidavit was not attached to the search warrant as issued, nor were driving instructions or a map. In preparation for executing the warrant, Tiffany briefed the officers who would be conducting the search. In that briefing, Tiffany drew maps on a chalkboard, exhibited aerial photos and assessor's maps, and supplied directions to the property, but he did not refer to the tax lot number of the property.

All of the descriptive information contained in the warrant was accurate except for the road address, which erroneously corresponded to premises located approximately one mile from defendant's property. The owner of the property at 3891 Paul Partlow Road was Judy Charbonneau, who testified that her property contained two residences: a log cabin-style home and, east of that, an off-white, two-story A-frame house. Both residences faced south. A wood-framed shop building and several inoperable vehicles were located to the west of the cabin, and a woodshed was located to the north of the cabin. Charbonneau testified that because of the rural nature of the area, she would not use her address to direct a visitor to her residence. Instead, she said she would draw a map.

Deputy Troxel, another sheriff's detective, testified that he and other officers customarily used tax lot numbers in executing rural search warrants. Although Troxel did not participate in the search of defendant's property, he testified that he had used a tax lot number and an assessor's map to identify rural properties "two or three times a month."

The trial court concluded that the warrant described defendant's property with sufficient particularity and admitted the evidence seized from defendant's property. After a jury trial, defendant was convicted on 14 counts: counts I, II, III, the three drug offenses, and counts VI through XVI, 11 of the weapons charges.

At sentencing, the trial court found that the drug convictions on counts I, II, and III resulted from three separate criminal episodes. The court imposed consecutive sentences on those counts, departed upward on count III, and

increased defendant's criminal history score from column G on count I to column F on counts II and III. The finding that counts I, II, and III arose from separate criminal episodes affected the court's sentencing decision in several ways. First, it enabled the court to impose consecutive sentences on those counts under ORS 137.123(2).[3] Second, the court imposed the consecutive sentences on those counts without shifting any of the convictions to column I of the sentencing guidelines gridblock. *Cf. State v. Rojas-Montalvo,* 153 Or App 222, 226, 957 P2d 163, *rev den* 327 Or 192 (1998) (holding that when sentences are imposed consecutively for offenses arising out of the same criminal episode, the court must, under OAR 213-012-0020(2)(a), shift defendant's criminal history score to column I for the secondary offenses).[4] Third, the court enhanced defendant's criminal history score on counts II and III in accordance with the rule in *State v. Bucholz,* 317 Or 309, 311-12, 855 P2d 1100 (1993), which permits sentencing courts to count convictions arising from separate criminal episodes in order to establish the presumptive sentences for later convictions that are sentenced in the same criminal proceeding. Finally, because it found that counts I, II, and III involved different episodes, the court also imposed the corresponding sentences without regard to OAR 213-008-0007(3)—the 400 percent rule—which generally limits the total duration of consecutive sentences and departure sentences to 400 percent of the maximum presumptive sentence for the primary offense.[5] *See State v. Davis,* 315 Or 484, 492, 847 P2d 834 (1993) (explaining the 400 percent rule); *see also State v. Miller,* 317 Or 297, 302-03, 307, 855 P2d 1093 (1993) (the 400 percent rule does not apply to "sentences derived

---

[3] ORS 137.123(2) provides, in part:

"If a defendant is simultaneously sentenced for criminal offenses that do not arise from the same continuous and uninterrupted course of conduct, * * * the court may impose a sentence concurrent with or consecutive to the other sentence or sentences."

[4] The court also sentenced all remaining counts consecutively, except counts VI, XIII, and X, but shifted those consecutive sentences to column I, apparently concluding that the offenses arose from the same episode as count III.

[5] OAR 213-008-0007(3) provides:

"When a departure sentence is imposed for any individual offense sentenced consecutively, the incarceration term of that departure sentence shall not exceed twice the maximum incarceration term that may be imposed for that offense as provided in OAR 213-012-0020(2)(a) [the 200 percent rule]."

from different criminal episodes"). The court sentenced defendant to a total prison term of 118 months.

■ In his first assignment of error, defendant contends, as he did before the trial court, that a police officer reading the warrant bearing Charbonneau's road address could reasonably have mistaken Charbonneau's property for that described in the warrant. If so, the warrant was invalid and the search illegal. *See State v. Blackburn/Barber*, 266 Or 28, 34-35, 511 P2d 381 (1973) ("If * * * a warrant purporting to authorize a search is sufficiently ambiguous that it is impossible to identify with a reasonable degree of certainty the particular premises authorized to be searched, the warrant may not be executed and any search pursuant to it is illegal, whether of the premises actually intended or not, because of the danger that the privacy of unauthorized premises will be invaded."). The state responds that the warrant's physical description of defendant's property, coupled with its listing of the unique tax lot number for that property, identified the property with sufficient particularity despite the incorrect street address. We agree.

■ A search warrant must describe with particularity the place to be searched. ORS 133.565(2); Or Const, Art I, § 9; US Const, Amend IV. In the analysis of a warrant's particularity, the statutory and constitutional issues merge. *State v. Edwards*, 149 Or App 702, 707, 945 P2d 553, *rev den* 326 Or 234 (1997). It is sufficient "if the description is such that the officer with a search warrant can with reasonable effort ascertain the identity of the place intended." *Steele v. United States*, 267 US 498, 503, 45 S Ct 414, 416, 69 L Ed 757 (1924); *Blackburn/Barber*, 266 Or at 35. A mistaken description of the premises to be searched can render a warrant invalid. *State v. Kadin/Coleman*, 172 Or App 353, 357, 18 P3d 484 (2001); *see State v. Davis*, 106 Or App 546, 809 P2d 125 (1991). In *Davis*, a warrant authorized the search of a "green single story house located at 1837 SE Main Street." This court concluded that a search of 1877 SE Main Street was unauthorized because the warrant was too ambiguous — it could apply either to 1837 SE Main, which was the only green house on the block, or to 1877 SE Main, which was the only house with the address listed on the warrant, but which

was not green. Because the warrant did not identify the correct house with reasonable certainty, we held that the warrant was invalid. *Id.* at 553.

■        However, not all address errors render a warrant invalid. In *Blackburn/Barber*, a warrant authorized the search of "Apartment Number 2 in the basement of the residence at 240 South Davis Street * * * said apartment having the letters ECURB on the door." In reality, the door to Apartment 2 had no letters; a card with the letters "ECURB" was attached to another door, without a number. Police searched the apartments behind both doors and arrested the occupant of each for marijuana possession. The Supreme Court concluded that the warrant did not particularly describe Apartment 2 but *did* particularly describe the ECURB apartment:

> "We hold there could be no real doubt as to which of the premises was intended by the warrant and that it could be ascertained with reasonable certainty. No one could have made a mistake or been confused about a word like ECURB, but anyone could easily have made a mistake about a numeral. ECURB was a significant and more unmistakable guide than a mere number." *Blackburn/ Barber*, 266 Or at 35-36.

In *Edwards*, the warrant directed officers to a specific address, 5482 W. Griffin Creek Road, but it also included an exacting physical description of and precise directions to the premises. This court determined that, despite the incorrect address, the directions would guide an officer executing a warrant only to the defendant's house.

> "Furthermore, it is uncontroverted that the physical description of the premises—including the color of the house and barn, the placement of the tree holding the 'No Hunting/No Trespassing' sign, the metal gate, and bales of hay—corresponded exactly to the searched premises. As in *Blackburn/Barber*, that exacting description was 'a significant and more unmistakable guide than a mere number.' " *Edwards*, 149 Or App at 709.

In summary, even if a warrant contains an incorrect street or road address, the warrant is nonetheless sufficiently particular if other information contained in the warrant provides a

precise description that is a significant and more unmistakable guide than a mere number.

In this case, the warrant describes one residence; Charbonneau's property clearly contains two. The warrant describes the residence to be searched as a two-story wood-frame dwelling; Charbonneau's property has an A-frame. The warrant mentions nothing similar to Charbonneau's primary residence, the log cabin. The warrant describes abandoned vehicles to the east of the residence; Charbonneau's property contains abandoned vehicles to the west of her log cabin. The warrant describes a wood-framed "car barn" south of the residence; Charbonneau's property has no buildings south of the cabin or the A-frame residence. In short, the physical property description contained in the warrant does not match Charbonneau's property.

In its ruling, the trial court emphasized the rural nature of both properties and the fact that the warrant included the tax lot number of defendant's property:

> "There is only one tax lot in Hood River County with the numbers set forth in the warrant. This tax lot in particular specifically matches [defendant's] property. The officers with the aid of a plat map could easily locate [defendant's] property exclusive of all other parcels of property. This distinctive notation in the warrant is enough to ensure that the officers executing the warrant could identify with a reasonable degree of certainty, the premises authorized to be searched."

Defendant argues that the trial court erroneously assumed that an officer executing a warrant "would bother to use a plat map and other tools." We disagree.

■■ A warrant's authority is wholly self-contained. *See Davis*, 106 Or App at 551-52 ("[T]he authority of an officer to search premises under a search warrant is wholly circumscribed by the description in the warrant. * * * The officer's independent knowledge cannot cure an erroneous description."). Accordingly, Tiffany's pre-search briefing of the searching officers is not relevant to consideration of the warrant's particular authority. Similarly, the *Blackburn / Barber* test for definiteness focuses not on the actions *actually taken* by the searching officers, but on the *future possibility* of

reasonable efforts of the officers to whom the warrant might be directed. Therefore, whether the officers actually used a plat map and tax lot number to locate defendant's property is similarly irrelevant to consideration of the warrant's authority. Instead, the question is whether "any police officer" executing the search warrant could ascertain *with reasonable effort* the identity of the place to be searched. Here, Deputy Troxel testified that he used tax lot descriptions and plat maps to identify rural properties typically "two or three times a month." Particularly in searches of rural properties, that practice is not unreasonable. *See State v. Eaton*, 60 Or App 176, 183, 653 P2d 250 (1982), *rev den* 294 Or 460 (1983) (holding that for search of rural property with a single building, "the description of the subject premises by tax lot number was sufficiently specific").

■ Defendant argues that the tax lot number easily could have been erroneous and misleading, as was the road address contained in the warrant. We disagree. Although the road address pointed to Charbonneau's property and the tax lot number pointed to defendant's property, the detailed description of the improvements on the property to be searched would leave a police officer reasonably certain that a search of only one—defendant's property—was authorized.[6] Therefore, we conclude that the trial court did not err in admitting the evidence seized pursuant to the warrant.

■ Defendant next assigns error to the sentence imposed by the trial court. He contends that the court was precluded from finding that any of his convictions arose from separate criminal episodes, because the indictment alleged that all of the charged offenses were "part of the same act and transaction." According to defendant, the state and the trial court were bound at sentencing by that allegation. Therefore, defendant argues, the court erred in sentencing counts I, II, and III consecutively under ORS 137.123(2), in failing to shift

---

[6] Defendant also appears to argue that the warrant's description was too general to be valid for *any* residence. The warrant's detailed description of vehicles and specific buildings and their positions around his residence, identified by color and orientation, sufficiently identified defendant's property. *See State v. Cole*, 84 Or App 497, 734 P2d 393 (1987) (concluding that a warrant listing the wrong street name but a detailed description of the property to be searched was sufficiently particular).

the convictions on counts II and III to column I, and in enhancing any of those sentences under *Bucholz*. As a consequence of those related errors, defendant contends that his total incarcerative sentence violated the 400 percent rule.

Defendant does not dispute that counts I, II, and III, in fact, arose from separate criminal episodes. Nor does he dispute that, but for the language of the indictment, the 400 percent rule would not apply to those sentences, the rule in *Bucholz* would apply, and the court also was authorized to impose consecutive sentences on each of those counts without complying with the shift-to-column I rule. However, defendant asserts—and the state concedes—that, if the trial court was bound by the language of the indictment, the 400 percent rule applies to the sentences on counts I, II, and III, and the total sentence exceeds the maximum lawful sentence by 22 months.[7] The state responds that the "same act and transaction" language in the indictment affected only the joinder of the charges for trial and was not controlling at sentencing. If the state is correct, the sentences imposed were lawful.

Defendant makes three specific objections to the court's failure to adhere to the allegation in the indictment that all counts arose from the same act and transaction. First, he argues that, in finding him guilty, the jury made a factual determination that all of the offenses *were* part of the same act or transaction and therefore necessarily were part of the same criminal episode. *See State v. Boyd*, 271 Or 558, 565-66, 533 P2d 795 (1975) (stating that the phrase "same act or transaction" is synonymous with the "same criminal episode"). *See also Knight*, 160 Or App at 403. Thus, defendant reasons, the trial court was required to follow the sentencing rules for offenses that arise from the same criminal episode. Defendant's first argument is mistaken. The trial court did not instruct, nor did the verdict form require, the jury to decide whether the offenses were part of the same act or transaction. *Cf. State v. Mack*, 108 Or App 643, 646, 817 P2d

---

[7] The trial court designated count III as the primary offense and imposed an upward departure sentence of 48 months under gridblock 8F. If the 400 percent rule were applicable, the maximum sentence would thus be 96 months (four times the maximum presumptive sentence of 24 months for a gridblock 8F conviction). The 118- month total sentence imposed exceeds that duration by 22 months.

1321 (1991) (distinguishing allegations relating to subcategory of the crime charged, which a jury must find beyond a reasonable doubt, from aggravating and mitigating factors, which a sentencing court may take into account to justify departures from a presumptive sentence). Therefore, the jury's verdict does not inform, much less govern, our inquiry into whether the sentences were lawful.

Second, defendant argues that the trial court improperly amended the indictment by ignoring, in its sentencing decision, the "same actor transaction" language in the indictment. A trial court may amend an indictment as to form, but it cannot amend an indictment as to substance. *State v. Wimber*, 315 Or 103, 113, 843 P2d 424 (1992). Defendant argues that the court's disregard of the "same actor transaction" allegation changed the state's theory of the case. However, an allegation that does not defeat the imposition of criminal liability is mere surplusage. *State v. Petersen*, 17 Or App 478, 482, 522 P2d 912 (1974). *See also State v. Coven*, 115 Or App 538, 544, 839 P2d 261 (1992) (Warren, P. J., specially concurring) (asserting that an allegation that does not defeat criminal liability is "necessarily" surplusage). Here, disregarding the allegation that the offenses were part of the same act or transaction, the indictment still alleged complete offenses on each count. Accordingly, we conclude that the court did not impermissibly amend the indictment.

Finally, defendant argues that the state was estopped from arguing at sentencing that his offenses arose from separate criminal episodes, and that the court was likewise bound. Defendant does not identify any particular branch of estoppel on which he relies. However, he contends that he "accepted the state's decision to allege that all the charges arose from a single criminal episode, and he relied on the state's choice of theories in deciding on a plea and preparing for trial." From that argument, we infer that defendant relies on the doctrine of equitable estoppel.[8]

---

[8] Estoppel is not a legal grab-bag of loosely connected principles. It has distinct branches that are composed of different elements and serve different purposes. *See generally* Note, *Judicial Estoppel: The Refurbishing of a Judicial Shield*, 55 Geo Wash L Rev 409 (1987) (describing differences in types of estoppel and summarizing approaches used by courts). We discourage litigants from assuming otherwise.

██ ██ The doctrine of equitable estoppel is "employed to prevent one from proving an important fact to be something other than what by act or omission he has led another party justifiably to believe." *Stovall v. Sally Salmon Seafood*, 306 Or 25, 33, 757 P2d 410 (1988) (quoting *Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 689, 669 P2d 1132 (1983)). In order to establish equitable estoppel, a party must offer evidence from which the trier of fact could find that:

> "(1) a false representation (albeit an innocent one) was made (2) by someone having knowledge of the facts to (3) one who was ignorant of the truth, (4) that the statement was made with the intention that it be acted upon by the [ignorant party] and (5) that [the ignorant party] acted upon it." *Paulson v. Western Life Insurance Co.*, 292 Or 38, 52-53, 636 P2d 935 (1981).

In acting upon the representation, the party claiming estoppel must have been prejudiced. *Stovall*, 306 Or at 34 n 7.

Defendant has not cited, nor have we found, a case in which the doctrine of equitable estoppel has been applied against the state so as to bind a criminal court at sentencing. Assuming without deciding that the doctrine might apply in some circumstances, defendant has not proved it here. Defendant does not contend that he was ignorant of the truth as to whether and which of the charged offenses arose from the same criminal episode(s). Nor has defendant made a convincing argument that he was prejudiced by the representation

---

Equitable estoppel is distinguished from the doctrine of judicial estoppel, which bars a party "from assuming a position in a judicial proceeding that is inconsistent with the position that the same party has successfully asserted in a different judicial proceeding." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609, 892 P2d 683 (1995). Judicial estoppel is concerned primarily with the integrity of the judicial process and not with the relationship of the parties, so, unlike equitable estoppel, "it does not depend for its application on a showing that the party raising judicial estoppel as an affirmative defense detrimentally relied on the other party's prior inconsistent position." *Id*. at 612.

It is unsettled whether and under what circumstances judicial estoppel applies against the government in criminal proceedings. *See State v. Bailey*, 143 Or App 285, 292, 924 P2d 833 (1996) (declining to apply judicial estoppel against the state in a criminal proceeding because this court will "reverse or modify trial court rulings only if those rulings are erroneous as asserted by the party assigning or cross-assigning error"). However, defendant has not referred to the doctrine or developed any argument concerning its possible application in this case. Therefore, we do not consider it further.

that the offenses arose from the same act or transaction, if it was false. If he had believed that he was prejudiced by improperly joined charges, defendant was free to move to sever the charges under ORS 132.560(3) ("If it appears, upon motion, that the state or defendant is substantially prejudiced by a joinder of offenses under subsection (1) or (2) of this section, the court may order an election or separate trials of counts or provide whatever other relief justice requires."). Instead, for whatever reason, he did not complain until sentencing. In short, defendant has not shown that he was ignorant of the truth or that he was prejudiced by the state's representation. He has not proved equitable estoppel.

Affirmed.